BALES *v.* EVANS.

1. EVIDENCE—FRAUD—TRIAL—ISSUES.
   Although broad latitude may be permitted in the introduction of evidence in support of the charge of fraud, relating to matters that may throw light upon the question at issue, and an elastic discretion must necessarily be granted to the trial court in ruling upon the testimony offered, clearly incompetent or prejudicial testimony is no more permissible in this class of cases than in any other.

2. TRIAL—MARRIAGE—ARGUMENT—CONDUCT OF COUNSEL.
   In an action brought by a married woman for fraudulent representations which induced her to purchase a hotel, counsel for plaintiff did not commit reversible misconduct in referring to the fact that her husband had children by a former marriage, during his opening of the case to the jury.

3. SAME—INCOMPETENT EVIDENCE—WITNESSES.
   Nor did the trial court err in declining to strike out testimony of the defendant, volunteered during his cross-examination, that he had run a "blind pig" in the hotel about 18 years before the trial, as too remote and irrelevant and immaterial; the witness proving to be unruly and evasive and the court ruling that the testimony could only be considered as affecting the credibility of the witness.

4. SAME.
   It is the duty of the court to interfere, either upon objection being made or without waiting for objections, to prevent counsel from browbeating, intimidating, or insulting any witness.

5. SAME—WITNESSES—PRIVILEGE.
   Where a witness has declined to answer a question on the ground of privilege, the jury may well be cautioned that they should not infer misconduct or criminality from the refusal, but should regard the same as failure of proof; counsel who argues to the jurors that the effect of such failure to answer amounts to an admission of guilt, commits reversible error.

Error to Allegan; Cross, J. Submitted April 28, 1914. (Docket No. 150.) Decided October 2, 1914.

Case by Elizabeth Bales against John Evans and another for fraud. Judgment for plaintiff. Defendants bring error. Reversed.

*Edward J. Anderson,* for appellants.

*Clare E. Hoffman,* for appellee.

STEERE, J. This action on the case was brought in the circuit court of Allegan county to recover damages claimed to have been sustained by plaintiff through misrepresentations of defendants whereby she was fraudulently induced to enter into a contract for the purchase of their hotel.

Defendants, who are husband and wife, owned and conducted a small hotel called the Junction House, located near the Lake Shore Railroad Station, in the city of Allegan. On February 5, 1913, plaintiff and her husband arrived in said city on the evening train from the West and went to the Junction House for the night. They were strangers in the city and had come from their former home in Iowa with the intention of renting a farm in the vicinity of Allegan, led to make the move through correspondence with a man named Littlejohn. In casual conversation between the parties, defendants learned the mission of their guests, and the talk which followed resulted in the latter contracting to buy the hotel for $3,500 and plaintiff making a first payment of $300 on the purchase price. The negotiations took definite form the following day, which was Saturday, and on Monday, February 8, 1913, the contract was signed, followed by the payment of $300 by plaintiff. Plaintiff's claim, briefly stated, was that defendants, having learned the circumstances and purpose which brought her and her husband to Allegan, and that they were unac-

quainted there, began systematically to discourage
them from their project, telling them there were no
advantageous opportunities to rent or buy land in
that vicinity, and that Littlejohn was dishonest, re-
lating cases of his having defrauded people in land
matters, etc., thus frightening them from consulting
him; that defendants then made it known they were
contemplating selling their hotel, owing to their
health and other plausible reasons, and Mrs. Evans
finally proposed that plaintiff buy it; that during the
negotiations which followed defendants represented
and falsely stated, in such manner as to then convince
plaintiff, that their house was the best hotel in Al-
legan, bore a good reputation, was patronized by
commercial travelers and the best class of the travel-
ing public, had been run in a respectable and moral
manner, and enjoyed a steady and profitable patron-
age, yielding a regular income of from $5 to $10 per
day; that by such representations, which they believed
and upon which they relied, plaintiff and her hus-
band were induced to enter into said contract, and she
to make the first payment as stated, without consult-
ing others, Mr. Evans requesting her not to tell any
one they had sold out; that she shortly thereafter took
possession, and soon discovered that the representa-
tions, which induced her and her husband, were false
and fraudulently made; that the house in fact bore
an unsavory reputation, had been conducted rather as
a rooming and assignation house than a reputable
hotel, had no regular patronage by the respectable
traveling public; that the income was inadequate,
and the business even as previously conducted had
been unprofitable, and the people who had resorted
to and patronized the place were not, as a rule, re-
spectable or of good repute; that upon learning such
facts plaintiff took an assignment of his interest in
the contract from her husband, who had paid noth-

.ing upon the same, tendered an assignment of said contract and possession of the property to defendants, repudiated the agreement, and demanded back the money she paid, which was refused, whereupon she removed from the premises and began this action.

Defendants pleaded the general issue, denied any and all charges of misrepresentation, and claimed that the hotel had been conducted properly and profitably and bore a good reputation. The issue of misrepresentation and fraud thus raised was tried upon its merits before a jury, with abundance of bitterly conflicting testimony, and resulted in a verdict and judgment in plaintiff's favor for $300 and interest.

Defendants' 29 assignments of error relate to rulings of the court in admission and rejection of testimony, the charge of the court, refusal to charge as requested, the opening statement and argument to the jury by plaintiff's counsel.

In the investigation of fraud it is said a broad latitude may be permitted in the introduction of evidence upon matters which may throw light upon the question at issue, and an elastic discretion must necessarily be left to the trial court within such range in guiding the course of the proceedings and ruling upon the many varying questions which exigencies of the case present, but clearly incompetent and prejudicial testimony or argument are no more permissible in this class of cases than any other. *Wessels* v. *Beeman*, 87 Mich. 481 (49 N. W. 483).

A careful reading of this record forces the conviction that numerous unseemly and intemperate things were permitted in the course of the trial, which should have been suppressed, though most of them are, under the conditions shown, such as to be regarded of that incidental class within the discretionary power of the court, with which appellate courts are loath to interfere except in distinct cases of abuse.

Certain of defendants' assignments of error are directed to such incidents, by which it is urged plaintiff's counsel continually brought before the jury prejudicial matter foreign to the issue, and thereby deprived defendants of a fair and impartial trial. We are impressed that such an atmosphere surrounded the case, and that both sides contributed to it.

Defendants' first assignment of error seriously urged arose from a portion of the opening statement of counsel, in which reference was made to children of plaintiff's husband. He was proceeding to narrate that, a day or two after the contract for the hotel was made, the husband went to Indiana after his children, to which counsel for defendants objected, and plaintiff's counsel said, "We will withdraw the children, wipe them out, consider they never existed," whereupon counsel for defendants said: "Trying to work a little sympathy on it. I object to it." After some further discussion the court told plaintiff's counsel to "Go ahead," and the latter then said, "I didn't care anything about it to begin with, but we don't propose to be interrupted all the time on something which is not material to the case." Having ruled it immaterial and stated he did not care anything special about it, counsel then, apparently because he did not "propose to be interrupted," proceeded to relate how her husband borrowed money of plaintiff and went to Indiana for his children. It is now claimed in plaintiff's brief that this was competent as bearing on the measure of damages; it being intended the children would become members of plaintiff's family in the hotel, and shown that they did return with their father for that purpose. While the propriety of this byplay might well be questioned, we think that in any view of the transaction the mention of plaintiff's stepchildren, who had no legal claim on her, would not be so prejudicial, standing alone, as to demand a reversal. It is not shown that they were

previously members of her family. She came from Iowa, and they were to come from Indiana. She had not lived with her husband after giving up the hotel contract, and when counsel asked if their marital relations were broken, she answered: "That is none of your business." The numerous cases cited by counsel in support of the contention that any reference to the children in a suit by the mother to recover damages for a tort to her is forbidden rest upon principles which have no application here, as an examination of the recent cases of *Johnson* v. *Grondin*, 170 Mich. 447 (136 N. W. 423), where previous decisions are reviewed, and *Rauhala* v. *Maki*, 172 Mich. 112 (137 N. W. 703), will disclose. In that class of cases the statute gives a separate right of action to the wife and children for the same wrong. To keep each distinct and preserve the rights of all in interest it is held that the case of the wife must be confined to her individual injuries, and the fact that she is the mother of children who might be dependent on her cannot be pressed upon the jury to swell her individual damages. The children mentioned here were not plaintiff's and had no claim on her.

An assignment of error urged and argued by defendants arises from interrogation of defendant John Evans, on cross-examination, as to his having violated the liquor law. He was asked:

"*Q.* Never was arrested and convicted for selling hard drinks?
"*A.* I defy you or any other man to ever find out where I ever sold any hard drinks in that house. Eighteen years ago I sold hard drinks and was pinched for running a blind pig in the old building, and pleaded guilty. Since then I have run my house straight."

His own counsel then moved to strike out this testimony, as to his being arrested, "on the ground that it is too remote, and as incompetent, irrelevant and

immaterial." The court denied the motion, stating, however, that it could only be considered as bearing on his credibility. We think this ruling was correct, and a wide range of inquiry particularly within the discretion of the court when such a witness is cross-examined. This witness was evasive, often irresponsive, reckless in declamation, and at times assumed to take charge and rule on the admission of evidence. He informed counsel who was cross-examining him:

"I don't care a darn for a judgment. It will do me no more good than a yellow dog. * * * You have got the wrong pig by the ear to fool around with me. I tell you that right now."

Interrogated as to certain alleged disorderly characters having stopped at his hotel, witness made impertinent personal retort with a wholly irrelevant assertion reflecting upon counsel. Being sharply questioned as to such volunteered assertion, he gave equivocal answers and finally admonished counsel to "never mind that." He was then asked, "Tell me what you know about that and how you came to make that statement," and answered, "That is far enough. Let us get down to business." Counsel was disposed to pursue this inquiry, but witness declined to be interrogated further and foreclosed the subject as follows: "I won't answer any more of those nonsensical questions." Whatever might be said, and could with propriety have been done in that connection, the court committed no error in refusing to strike out the volunteered testimony of this defendant as to his having run a "blind pig."

The right is inherent in the court to check and silence any witness or counsel who is going beyond reasonable and legitimate bounds in his method of testifying or examining, and "it is the plain duty of the court to interfere on objection, or without, when the attempt is made by counsel to browbeat, insult,

or to intimidate witnesses." 5 Jones' Commentaries on Evidence (Ed. 1914), § 815.

A witness named Jennie Davis was called by plaintiff, and examined touching her resorting to this hotel, and the conduct of certain persons who put up there. She was manifestly a reluctant witness, and denied staying at the hotel with a man named Clark, in answer to one of the first questions asked her. Counsel then said:

"I want to inform you—you realize you are under oath, do you? Do you realize that if you testify to an untruth here that you can be prosecuted for perjury?"

This witness was permitted to be rigidly cross-examined, by the counsel who called her, as to her conduct at the hotel and relations with men there. Her answers were sufficiently evasive, equivocal, and in denial that it was fairly within the discretion of the court to allow proper leading questions to be asked, on the ground that she was a reluctant and hostile witness. It would have been proper for the court, in its discretion, in view of the attack made by counsel calling her, to inform her of the constitutional right of a witness to decline to answer incriminating questions. No suggestion to that effect was made by any one, and her examination was apparently concluded when she was first excused from the witness stand. Counsel for plaintiff thereafter called a witness named Emma Marks, whom he also examined by leading questions, and who in an evasive manner, with many contradictions, testified in substance that she had personal knowledge of a certain man staying at the hotel with a woman who was not his wife, and whom she could not or would not identify. Being asked on cross-examination by defendants' counsel if she was not that woman, counsel for plaintiff interposed and said:

"Wait a minute. I ask that the witness be instructed that she don't need to answer that question as to whether it was her or not."

Being instructed by the court as to her right, the witness refused to answer, and when the subject was again approached in cross-examination, lest she forget, counsel would again interpose, "Wait a minute," and suggest that she again be advised. Counsel for defendants argued to the court that the witness, having disclosed part of the transaction, had waived her privilege, and moved that she be directed to answer, or, if not, that all her testimony relative to the unidentified woman be stricken out. These motions were both denied, and her refusals to answer, on suggestion of plaintiff's counsel, stood. Following this, plaintiff's counsel recalled Jennie Davis and asked:

"*Q.* I understand that you want to withdraw the answer to some questions that you made here before?"

"*A.* Yes, sir."

"*Q.* Now, I will ask you whether or not you know of any one man and woman occupying any of the rooms there at Evans' hotel who were not married to each other?"

To which witness replied, "I refuse to answer." In his closing argument to the jury one of the counsel for plaintiff commented upon this against objection, saying in part:

"Then when it was put up to her if she had ever stayed with another man, what does she say? 'I decline to answer,' and the judge asks her if she claims her constitutional privilege, and she does. What is the constitutional privilege?"

Counsel for defendant interposed an objection to any inferences being argued to the jury from the witness claiming her constitutional right, and plaintiff's counsel replied, "We will, though, unless the judge stops us." A ruling being asked, this argument was

allowed to continue and the changes were rung before the jury on the significance of "I refuse to answer." This error alone, irrespective of other questions as to those witnesses, entitles defendants to a new trial. If any reference to the witness' refusal to answer was made to the jury, it should have come from the court, with the caution that they could not infer misconduct or criminality on the part of a witness from such refusal to answer, but should regard it "as a failure of proof" as to such witness. *People* v. *Brewer,* 27 Mich. 134. Comment, or argument to the contrary by counsel to the jury, is prohibited. *Carne* v. *Litchfield,* 2 Mich. 340; *Knowles* v. *People,* 15 Mich. 408; *Foster* v. *People,* 18 Mich. 266; *People* v. *Maunausau,* 60 Mich. 15 (26 N. W. 797).

The judgment is reversed, and a new trial is granted.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.