Edward LODE, Jr., et al., Plaintiffs,

v.

Gary LEONARDO, et al., Defendants.

No. 82 C 4122.

United States District Court,
N.D. Illinois, E.D.

Oct. 12, 1982.

Demetri J. Retson, Richard J. Lipschultz, Bortman, Retson & Lipschultz, Chicago, Ill., for plaintiffs Edward Lode, Jr., Anne S. Lode, John L. Jachimiec, Nicholas Kupchick, and Cecilia Jachimiec.

Thomas P. Ward, Chicago, Ill., for defendants Gary Leonardo, Seymour Goldgehn, Leonard Musich, Bernard Davis, Clifford McGillivray, Hickory Bancorp, Inc., Bank of Hickory Hills, Worth Bancorp, Inc. and Worth Bank & Trust.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This case is before the Court on the defendants' motion to dismiss the Amended Verified Complaint ("Complaint") in its entirety. The case involves a shareholders' derivative action brought on behalf of the shareholders of four Illinois corporations. Two of the defendant corporations, Hickory Bancorp, Inc. and Worth Bancorp, Inc., are bank holding companies. The other two corporate defendants are the banks controlled by these holding companies, Bank of Hickory Hills and Worth Bank & Trust. Three of the individual defendants, Gary Leonardo, Seymour Goldgehn, and Bernard

Davis, are directors of all four corporations. Defendant Gary Leonardo is also the president and chairman of the board of each of the four corporations.

The action arises out of a series of loans made by the two banks. In Counts I, IV, V, VIII, and XII of their sixteen-count Complaint, the plaintiffs allege that various violations of section 104 of the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRA"), 12 U.S.C. § 375b, occurred in connection with these loans. The plaintiffs assert that they have either an express or, in the alternative, an implied private right of action for these violations.

In Counts II and VI of the Complaint, the plaintiffs allege that certain activities of some of the individual defendants in connection with the loan transactions constituted violations of section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The plaintiffs accordingly assert the private right of action granted to victims of RICO violations by section 1964(c) of the statute.

In support of their motion to dismiss the Complaint in its entirety, the defendants first argue that the plaintiffs have no private right of action under FIRA and that this Court thus lacks subject matter jurisdiction over the claims asserted under that statute. The defendants next argue that the claims based upon section 1964(c) of RICO must be dismissed because Congress never intended that RICO should be used in a case such as this one. If the claims grounded on federal statutes are thus dismissed, the defendants argue, then this Court lacks the jurisdictional basis upon which to hear the pendent claims, and they too must be dismissed.

## A.

The provisions of 12 U.S.C. § 375b limit the loans which member banks of the Federal Reserve System may make to their executive officers and other insiders. These loan limiting provisions are made applicable to federally insured banks which are not members of the Federal Reserve System by 12 U.S.C. § 1828(j)(2). The Hickory Hills Bank and the Worth Bank & Trust are two such nonmember banks which are subject to the section 375b loan limits as applied through section 1828(j)(2). The plaintiffs allege that a number of loans made by the two banks violated the limits established by section 375b. The plaintiffs contend that a private right of action is expressly provided for such violations of section 375b by nonmember banks under 12 U.S.C. § 503.

An examination of 12 U.S.C. § 503 reveals that it expressly grants a private remedy for violations of sections 375, 375a, and 376. But section 375b, added to section 22 of the Federal Reserve Act in 1978 by FIRA, is not included among the sections listed in the United States Code at 12 U.S.C. § 503. The plaintiffs seek to overcome this difficulty by pointing out that the original version of 12 U.S.C. § 503, which appears in the Statutes at Large as subsection (f) of section 22 of the Federal Reserve Act, does not enumerate the particular provisions of the Federal Reserve Act to which it applies. Instead, the original version uses the general term "this section," referring to all of the provisions of section 22 of the Federal Reserve Act, to designate the provisions within its scope. Thus, since 12 U.S.C. § 375b was made a part of section 22 of the Federal Reserve Act when it was added in 1978, the plaintiffs argue that section 375b is within the scope of section 503 even though not enumerated in the codified version of that statute.

It appears that the plaintiffs are correct on this point. The Statutes at Large control when the version of a law appearing in the United States Code is inconsistent with that in the original statutes. *See United States v. Welden,* 377 U.S. 95, 98 n. 4, 84 S.Ct. 1082, 1085 n. 4, 12 L.Ed.2d 152 (1964) (and cases cited therein). A fair reading of the original version of 12 U.S.C. § 503, as it appears in the Statutes at Large, leads to the conclusion that the private remedy it provides is applicable to all provisions of section 22 of the Federal Reserve Act, including the provision added in 1978 which is now codified at 12 U.S.C. § 375b.

■ This conclusion, however, does not end the inquiry into whether the plaintiffs may avail themselves of the private right of action 12 U.S.C. § 503 provides for violations of 12 U.S.C. § 375b. By its terms, section 503 applies only to banks which are "members" of the Federal Reserve System. Hickory Hills Bank and the Worth Bank & Trust are not members of the Federal Reserve System. The loan limitations of 12 U.S.C. § 375b apply to these two banks only because they are insured under the Federal Deposit Insurance Act. A section of that Act, 12 U.S.C. § 1828(j)(2), incorporates the "member" bank loan limits of section 375b by reference and makes them applicable to nonmember insured banks "in the same manner and to the same extent as if such nonmember insured bank[s] were . . . member bank[s]." Plaintiffs argue that this language not only extends the loan limitations of section 375b to nonmember insured banks, but that it also requires nonmember insured banks to be treated as "member" banks for purposes of private actions under section 503. The plaintiffs' rationale for this contention is that it would be senseless to impose upon nonmember banks the limiting provisions applicable to "member" banks under section 375b without also imposing the identical sanctions which are available against "member" banks for violations of section 375b.

While somewhat reasonable, this argument is not convincing. A reading of section 1828(j)(2) shows that the language, "in the same manner and to the same extent" can only refer to the language, "[t]he provisions of section 375b of this title, relating to limits on loans." This very specific incorporation of the loan limiting provisions can not be interpreted as an incorporation of the private right of action contained in section 503 with regard to "member banks." Section 1828(j)(2) incorporates the loan limits contained in section 375b; it does not thereby automatically incorporate a remedy from section 503. Accordingly, it is not possible to conclude that the plaintiffs have an express private right of action for the violations of section 375b which they allege in connection with the nonmember Hickory Hills Bank and Worth Bank & Trust.

■ In the alternative, the plaintiffs maintain that even absent an express private right of action, the circumstances are such that a private right of action should be implied for them under 12 U.S.C. § 1828(j)(2). In deciding whether a private cause of action is implicit in a federal law when the statute is silent on that issue, the focus is on the intent of Congress. *Middlesex County Sewage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981). "Congressional intent may be discerned by looking to the legislative history and other factors: *e.g.,* the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional roles of the States in providing relief." *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 1839 n. 60, 72 L.Ed.2d 182 (1982) (citing *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)).

12 U.S.C. § 1828(j)(2) was enacted in 1978 as part of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95–630, § 108, 92 Stat. 3641, 3664. The section amended the Federal Deposit Insurance Act by adding provisions limiting the loans which federally insured banks that do not belong to the Federal Reserve System can make to their executive officers, directors, and certain classes of owners. The section also added enforcement provisions to be utilized by the Federal Deposit Insurance Corporation in the event the loan limits were violated.

■ According to the House report, Congress enacted FIRA in large measure because of its deep concern with various problems in the banking industry, especially self-dealing and other abuses by insiders. Overextension of credit to large shareholders and other insiders was documented as the leading cause of bank failures among

state-chartered, federally insured institutions, and such abuses were therefore seen as a major threat to the security of the insurance fund maintained by the FDIC. A principal problem area was identified as the wide variation in state laws regulating insider loans. A means of ameliorating this problem was to create a uniform, nationwide standard for insider loans made by federally insured banks, regardless of their membership in the Federal Reserve System. H.R.Rep. No. 1383, 95th Cong., 2d Sess. 10–11, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9282–83.

Congress clearly indicated that the limits it imposed were designed to protect savers in federally insured banks by strengthening the hand of federal bank regulators:

> State-chartered banks maintain over $400 billion in deposits, a substantial portion insured by the Federal Deposit Insurance Corporation. With the magnitude of this potential impact on the insurance fund, your committee believes that the FDIC and the Federal Reserve should have a full range of powers to limit insider abuses in institutions over which they have supervisory jurisdiction.

> The inclusion of federally insured institutions under the 10-percent limitation assures that bank insiders in a given community or area will be treated alike. Your committee believes that this uniform standard will make it much easier for examiners to establish control over insider abuses and to back up their enforcement efforts with bank insiders.

*Id.* The section-by-section summary of FIRA contained in the House report further indicates an intent to rely on regulation rather than private action as a means of enforcing the limits imposed on federally insured nonmember banks. Describing the provisions of section 108 of FIRA, now codified at 12 U.S.C. §§ 1828(j)(2)–(3), the House report stated:

> Section 108 would make the requirements of section 22(h) of the Federal Reserve Act applicable to insured nonmember banks and would authorize civil money penalties to be assessed against insured nonmember banks for violations of sections 22(h) and 23A of the Federal Reserve Act to the same extent that civil money penalties may be assessed against member banks.

*Id.* at 42; U.S.Code Cong. & Ad.News at 9314.

Had there been, at the time Congress created these carefully crafted regulatory controls over insider loans by federally insured nonmember banks, a well established *implied* remedy for loan limit violations by national banks or state member banks of the Federal Reserve System, the plaintiffs would have a stronger argument that such an implied remedy should exist for loan limit violations by nonmember banks. If an implied remedy was part of the existing legislative scheme, there would be an inference that Congress had not supplanted it but was merely supplementing it by creating regulatory remedies for nonmember violations. *See Merrill Lynch, supra.* However, the private right of action contained in 12 U.S.C. § 93 pertaining to national banks and 12 U.S.C. § 503 pertaining to state member banks is express rather than implied. Knowing of these express grants of a private remedy for other loan limit violations, it hardly seems likely that Congress would have enacted loan limits for nonmember banks without an equivalent express remedy had it intended such a private remedy to exist for nonmember violations.

The conclusion which is compelled is that Congress intended to create a uniform limit for insider loans made by federally insured nonmember banks in order to protect the saving public and the federal insurance fund from the depredations of self-dealing insiders. Congress created a system of regulatory remedies to enforce the loan limitations it imposed, but it did not adopt the express private rights of action it had previously created for abuses involving national banks and state member banks. Under these circumstances, it cannot be said that Congress intended that a private right of action should be implicit in 12 U.S.C. § 1828(j)(2).

The defendants' motion to dismiss is therefore granted with regard to Counts I, IV, V, VIII, and XII of the Complaint which are based on 12 U.S.C. § 1828(j)(2).

### B.

■ Counts II and VI of the Complaint are based upon section 1964(c) of RICO. That section provides a private right of action for treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962" of RICO. This civil remedy exists independently of RICO's criminal penalties. A criminal prosecution or conviction is not a prerequisite to the initiation of a private lawsuit under section 1964(c) of RICO.

The defendants have moved under Fed.R. Civ.P. 12(b)(6) to dismiss the two RICO counts of the Complaint for failure to state a claim upon which relief can be granted. The gist of the defendants' argument is that RICO is a potent weapon designed for use in the battle against "organized crime" and that it is therefore inapplicable to a case such as this one involving only what the defendants characterize as "garden-variety fraud claims" against "legitimate businesses and legitimate businessmen." In the defendants' view, the civil remedy provided in section 1964(c) of RICO must be reserved for cases involving the nefarious deeds of hoodlums and mobsters. Since RICO was conceived with "racketeers" and "racketeering activities" in mind, the defendants urge that "legitimate" organizations and businessmen who run afoul of RICO's proscriptions must be excluded from the coverage of section 1964(c). According to the defendants, Congress never intended that a crime fighting statute such as RICO should be used to obtain federal jurisdiction over what would otherwise be a state law fraud case.

The argument advanced by the defendants has met with some degree of support. *See, e.g., Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736, 746–48 (N.D. Ill.1981). RICO was indeed enacted as Title IX of the Organized Crime Control Act of 1970, a sweeping package of laws designed to "seek the eradication of organized crime in the United States." And, in enacting the bill into law, Congress articulated its deep concern with the societal threat posed by organized criminal cartels such as La Cosa Nostra.

■ However, Congress did not limit the scope of RICO to those involved in what traditionally has been thought of as "organized crime." *Bennett v. Berg,* 685 F.2d 1053 at 1063–1064 (8th Cir.1982) (citing numerous courts and commentators to the same effect); *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 at 457 (7th Cir.1982) (dicta). Any "person" as that term is broadly defined in RICO, whether associated with organized crime or not, can commit a RICO violation. And any person injured in his business or property by such a violation may then sue the violator for damages in federal court. The statute makes no exceptions for "legitimate" persons who commit technical violations of RICO in a commercial context. Such persons are no less amenable to a private lawsuit under section 1964(c) than an underworld figure who violates the statute. It is the violation of the statute which controls, not the status of the violator.

■ In this case, certain individual defendants are alleged to be "persons" who conducted the affairs of two interstate "enterprises," the Hickory Bank and the Worth Bank & Trust, through "patterns of racketeering activity" consisting of several acts of mail fraud. This is an adequate description of a violation of section 1962(c) of RICO to state a claim for relief under section 1964(c) of the Act.

This conclusion is not inconsistent with Judge Shadur's recent rulings in *Parnes v. Heinold Commodities, Inc.,* 539 F.Supp. 199 (N.D.Ill.1982) and *Fields v. National Republic Bank of Chicago,* 548 F.Supp. 20 (N.D.Ill. 1982). In those cases the Court articulated its disfavor with using RICO in a manner apparently unforeseen by the drafters of the statute. However, in both cases the RICO counts were dismissed because of deficiencies in the pleadings and not because

of the notion that RICO should apply only to "real" criminals.

The defendants in this case have not demonstrated that the plaintiffs have failed to meet the technical requirements for pleading a claim under RICO. The closest they come to such an objection is an assertion that the plaintiffs have not alleged the requisite "pattern of racketeering activity." This assertion is unfounded. In the definition section of RICO, 18 U.S.C. § 1961, mail fraud is clearly listed as a "racketeering activity." Since the plaintiffs have alleged that at least two such acts of "racketeering activity" were committed by the defendants within a ten year period, they have unquestionably met the requirement for pleading the "pattern of racketeering activity" element of a RICO violation. *See* 18 U.S.C. § 1961(5).

Congress may not have envisioned that the civil remedies it supplied in RICO would find the widespread use that they have in commercial fraud cases. And such use of RICO's remedies may well be somewhat undesirable. But, when a plaintiff makes allegations which appear to state a claim under the statute as it is written, it is not the function of this Court to reject that claim on the ground that Congress must have meant something other than what it said in the statute. Accordingly, the defendants' motion to dismiss is denied with respect to Counts II and VI of the Complaint. And, since a substantial federal claim therefore remains before the Court, the motion to dismiss is denied with respect to the plaintiffs' pendent claims as well.

For the foregoing reasons, the defendants' motion to dismiss is granted with respect to Counts I, IV, V, VIII, and XII, and is denied with respect to the remaining counts.